## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RYAN SEGAL, individually and on behalf of all others similarly situated, | Case No. 24-1783 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| AMADEUS IT GROUP, S.A.; AMADEUS HOSPITALITY AMERICAS, INC.; HILTON WORLDWIDE HOLDINGS INC.; MARRIOTT INTERNATIONAL, INC.; THE RITZ-CARLTON HOTEL COMPANY, LLC; ACCOR S.A.; INTERCONTINENTAL HOTELS GROUP PLC; HYATT HOTELS CORPORATION; STARWOOD HOTELS & RESORTS WORLDWIDE, INC.; FOUR SEASONS HOTELS LIMITED; MINOR HOTEL GROUP, LTD.; OMNI HOTELS MANAGEMENT CORP. DBA OMNI HOTELS & RESORTS; and LOEWS CORPORATION. | |
| Defendants. | |

Plaintiff Ryan Segal, individually and on behalf of himself and all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to himself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint to recover treble damages and to obtain injunctive relief and other relief as appropriate, against Defendants Hilton Worldwide Holdings, Inc.; Marriott International, Inc.; Ritz-Carlton Hotel Company, LLC; Accor S.A..; InterContinental Hotels Group PLC; Hyatt Hotels Corporation; Starwood Hotels & Resorts; Four Seasons Hotels Limited; Minor Hotel

1

Group, Ltd.; Omni Hotels Management Corp.; and Loews Corporation; (collectively "Hotel Defendants"); Amadeus IT Group, S.A.; and Amadeus Hospitality Americas, Inc. for violating the Sherman Antitrust Act.

## NATURE OF THE ACTION

1.     Hotel Defendants operate hotels in the ultra-premium "luxury" segment of the hotel market ("Luxury Hotels").

2.     From at least March 1, 2020 through the present (the "Relevant Period"), Defendants and their co-conspirators have engaged and continue to engage in a nationwide conspiracy to fix, raise, maintain, and/or stabilize the price of rooms in Luxury Hotels ("Luxury Hotel Rooms") in metropolitan markets across the country through the use of Amadeus's Demand360 platform.

3.     Defendants Amadeus IT Group, S.A. and Amadeus Hospitality Americas, Inc. (together, "Amadeus") own and operate the Demand360 platform, which provides participating hotels, including Hotel Defendants and their co-conspirators, with 12 months of forward-looking demand data, both directly and through other software platforms. This is a "give to get" arrangement. That is, Hotel Defendants' access to Demand360 is conditioned on them providing forward-looking demand data to competitors through the platform. Thus, this data would not be accessible to users were it not for the unlawful sharing of non-public present and future occupancy data and information between the Defendants.

4.     Hotel Defendants are owners and operators of Luxury Hotels in the United States and users of Amadeus's Demand360 platform. They include Defendants Hilton

Worldwide Holdings Inc.; Marriott International, Inc.; The Ritz-Carlton Hotel Company, LLC; Accor S.A.; InterContinental Hotels Group PLC; Hyatt Hotels Corporation; Starwood Hotels and Resorts Worldwide, Inc.; Four Seasons Hotels Limited; Minor Hotel Group, Ltd.; Loews Corporation; and Omni Hotels Management Corp.

5. Defendants' co-conspirators are additional owners, operators, or organizations of Luxury Hotels in the United States and users of Amadeus's Demand360 platform. They include Hongkong and Shanghai Hotels Limited d/b/a The Peninsula Hotels ("Peninsula"); Indian Hotels Company Limited, owners and/or operators of the Taj Hotels chain ("Taj Hotels"); Dorchester Collection Ltd. ("Dorchester"); and Preferred Hotels & Resorts, a provider of sales, marketing and distribution services to hotels (together, "Conspirators").

6. Luxury Hotels are recognized as a distinctive category in the hospitality industry. Luxury Hotels are generally five-star hotels which prioritize providing an exceptional and exclusive experience to their guests, often characterized by high-end amenities, upscale rooms, personalized services, and a commitment to surpassing customer expectations. They typically accommodate high-paying guests, who expect the hotel's amenities, services, and dining experiences to be of high quality. As such, travelers recognize Luxury Hotels Rooms as a distinct market.

7. Demand360 launched in 2015. In the past few years, Demand360 has also been integrated into another Amadeus product called RevenueStrategy360—a single platform that displays data from both Demand360 and Amadeus's Rate360, which

provides forward-looking room price data. At least some of the Hotel Defendants use RevenueStrategy360.

8. Demand360 data is also integrated into other, independently owned, revenue management software products used by certain of the Hotel Defendants, such as iDeaS revenue management software, which is used by the Four Seasons.[1]

9. Through the use of Demand360, Hotel Defendants and Conspirators unlawfully share non-public present and future occupancy data with one another. This unlawful sharing of information allows participating hotels to set rates for Luxury Hotel Rooms higher than they would absent Defendants' agreement to exchange information, resulting in substantial damages to Plaintiff and other members of the Class who overpaid for rooms at hotels owned and/operated by the Hotel Defendants.

10. Use of Demand360 is conditioned on contributing non-public, forward-looking demand data to the Demand360 common data pool. In other words, Hotel Defendants colluded by agreeing to participate in Demand360 with the understanding that, to do so, they must contribute proprietary, non-public, forward-looking demand data, and with the knowledge that their competitors, other Demand360 participants, are doing the same.

11. By doing so, Defendants and Conspirators engaged in a hub-and-spoke conspiracy to restrain trade. By using Demand360 (the hub) with knowledge and assurance that others were asked to participate and cooperation (i.e., sharing current and

---

[1] https://ideas.com/news/travelclicks-demand360-enhances-ideas-advanced-revenue-management-solutions-first-kind-integrated-solution/.

forward-looking occupancy data) was essential to successful operation of the plan, the Hotel Defendants (the spokes) formed a horizontal agreement in restraint of trade (the rim). Defendants' conduct is not meaningfully different from that held to be a violation of § 1 of the Sherman Act in *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939).

12.     Alternatively, each of the Hotel Defendants entered into vertical agreements with Amadeus whereby each operator used the Demand360 information to restrain trade.

13.     By virtue of exchanging proprietary, non-public, present and forward-looking demand data, the Hotel Defendants have been able to charge increased rates for rooms at Luxury Hotels despite historically low overall demand, divorced from the market forces that drive supply and demand in a competitive environment. They would not have been able to do so in a competitive market. Instead, competition would have forced the Hotel Defendants to lower room rates in order to put "heads in beds."

14.     Rather than function as separate economic entities, the Hotel Defendants agreed to make key competitive decisions regarding the supply of Luxury Hotel Rooms collectively. The Hotel Defendants accomplished this through using Demand360. The Hotel Defendants knew that their mutual access to the data available through their use of Demand360 would allow them to price their rooms according to their collective goal of boosting revenue by increasing rates without regard for the typical market forces that drive supply and demand in a competitive environment.

15.     Before the introduction of coordinated demand software, Luxury Hotel owners and operators independently set prices, and generally did so to maximize

occupancy rates. If the supply of available rooms was high, market prices would drop, as allowing rooms to stand vacant at their advertised price made little sense when similar Luxury Hotels in the area were available for less. Thus, in the past, Luxury Hotel owners and operators had an incentive to lower room rates until all available units were occupied.

16.     By contrast, armed with the occupancy data from Demand360, Hotel Defendants no longer need to cut prices to fill rooms but can increase (and maintain) artificially inflated rates based on otherwise proprietary information about competitors' room supply. Without the knowledge of competitors' non-public present and future demand and occupancy, a hotel would normally lower rates to gain market share.

17.      Each Defendant knew that the plan, if carried out, would result in increased room rates and, with this knowledge, each Hotel Defendant participated in the plan. The Hotel Defendants all shared an interest in seeing that their competitors subscribed to Amadeus's Demand360 platform.

18.     As a result of Defendants' unlawful information sharing, renters of Luxury Hotel Rooms in the United States have been overcharged and have paid supracompetitive prices to stay in Defendants' hotels.

## JURISDICTION AND VENUE

19.     Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to secure injunctive relief against Defendants for violating the Sherman Act, 15 U.S.C. § 1, and to recover actual and compensatory damages, treble damages,

interest, costs, and attorneys' fees for the injury caused by Defendants' wrongful conduct, under § 4 of the Clayton Act, 15 U.S.C. § 15(a).

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $5,000,000 and members of the Class are citizens of a different state than Defendants.

21.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c), and (d). One or more Defendants resided, transacted business, were found, had agents in, or engaged in substantial activity in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

22.     This Court also has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) rented substantial numbers of hotel rooms throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

23.     The activities of Defendants, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

**THE PARTIES**

**A. Plaintiff**

24.      Plaintiff Ryan Segal ("Segal") is a resident of Chicago, Illinois. Segal paid for a Luxury Hotel Room at the Ritz-Carlton Marina Del Rey in 2023. Segal paid a higher hotel room price directly to Defendants by reason of the violations alleged herein. Segal intends to stay at Luxury Hotels owned and/or operated by Defendants in the future.

**B. Defendants**

25.     Defendant Hilton Worldwide Holdings, Inc. ("Hilton") is a Delaware corporation with its principal place of business in McLean, Virginia. Hilton was a founding partner of Demand360 and its hotels continue to use Demand360. Hilton also uses RevenueStrategy360. In the Luxury Hotel market, Hilton operates the following brands: Waldorf-Astoria, LXR, and Conrad.

26.     Defendant InterContinental Hotels Group PLC ("IHG") is a British public limited company with its headquarters in Denham, United Kingdom. InterContinental was a founding partner of Demand360 and its hotels continue to use Demand360. IHG also uses RevenueStrategy360. In the Luxury Hotel Market, IHG operates the following brand: InterContinental.

27.     Defendant Hyatt Hotels Corporation ("Hyatt") is a Delaware corporation with its principal place of business in Chicago, Illinois. Hyatt was a founding partner of

Demand360 and its hotels continue to use Demand360. Hyatt also uses RevenueStrategy360. In the Luxury Hotel Market, Hyatt operates the following brands: Park Hyatt, Andaz, Alila, Miraval, Destination by Hyatt, Unbound Collection, Grand Hyatt, and Thompson Hotels.

28.     Defendant Marriott International, Inc. ("Marriott") is a Delaware corporation with its principal place of business in Bethesda, Maryland. Marriott owns 100% of Defendant Ritz-Carlton Hotel Company, LLC. In 2015, Marriott acquired Starwood Hotels & Resorts Worldwide Inc. ("Starwood"). Marriott and Starwood were founding partners of Demand360 and continue to use Demand360. Upon information and belief, Marriott also uses RevenueStrategy360. In the Luxury Hotel market, Marriott operates the following hotel brands: 1 Hotels, Ritz-Carlton, St. Regis, The Luxury Collection, W Hotels, Edition, Bulgari Hotels & Resorts, and JW Marriott. Marriott operates at least 132 luxury hotels in the United States.[2]

29.     Defendant Accor S.A. is a French société anonyme with headquarters in Issy-les-Mouilineaux, France. Accor owns and/or operates a number of luxury hotel brands, including 21c Museum Hotels, Raffles, Sofitel, Fairmont, SLS, and Mondrian. Accor also owns and/or operates a number of individual luxury hotels, including the Faena and Delano hotels in Miami, FL.

30.     Defendant Ritz-Carlton Hotel Company, LLC ("Ritz-Carlton") is a limited liability company registered in Delaware and with its principal place of business in

---

[2] https://marriott.gcs-web.com/static-files/b82978a6-9d28-4e38-9855-fc4ae2cebe11.

9

Bethesda, Maryland. It is a wholly owned subsidiary of Marriott International, Inc. Ritz-Carlton's hotels use Demand360.

31.     Defendant Four Seasons Hotels Limited (the "Four Seasons") is a Canadian Limited Company headquartered in Toronto, Ontario, Canada. The Four Seasons owns and/or operates over 100 hotels worldwide, including in the United States, in the luxury market. On September 28, 2016, Travelclick announced that revenue management software iDeaS was incorporating Demand360 data. Upon information and belief, the Four Seasons gained access to Demand360 data at this time and continues to utilize Demand360 data.

32.     Defendant Omni Hotels Management Corp. ("Omni") is a Delaware corporation with its headquarters in Dallas, TX. Omni does business as Omni Hotels & Resorts. Omni owns and operates Luxury Hotels in the United States. Omni uses Demand360.[3]

33.     Defendant Loews Corporation is a Delaware corporation headquartered in New York, NY. Loews owns and/or operates over 25 Luxury Hotels in the United States. Loews hotels use Demand360.

34.     Defendant Amadeus Hospitality Americas, Inc. is a Delaware corporation with its principal place of business in Portsmouth, New Hampshire.

---

[3] In connection with sworn testimony before Congress, Omni employee Jamie Pena disclosed that he or she oversaw the adoption of Demand360 for Omni. *See* https://docs.house.gov/meetings/IF/IF17/20160524/104976/HHRG-114-IF17-TTF-PenaJ-20160524.pdf.

35.     Defendant Amadeus IT Group, S.A. (together with Amadeus Hospitality Americas, Inc., "Amadeus") is a Spanish Sociedad Anonima headquartered in Madrid, Spain. Amadeus owns and operates the Demand360 platform, which it acquired in its acquisition of Travelclick, Inc. in 2018. The Demand360 platform includes demand and rate insights from 44,000 hotels, and 12 months of forward-looking rate and demand data provided to hotels, both directly and through other software platforms.

## FACTUAL ALLEGATIONS

### A. The History and Scope of Defendants' Anticompetitive Scheme

#### 1. Historical competition in the Luxury Hotel Room market.

36.     Before the Hotel Defendants adopted Demand360, competition in the Luxury Hotel Room market was driven by a desire to fill rooms and maintain the highest possible occupancy levels—to keep "heads in beds."

37.     The goal of competing to put "heads in beds" is easy to intuit. There are very high fixed costs associated with building, staffing, and maintaining a Luxury Hotel. In contrast, the marginal costs incurred by the Luxury Hotel operator in renting a room are low. In other words, the costs of owning and maintaining a room in a Luxury Hotel are not significantly different whether the room is occupied or not. Vacant rooms, therefore, lead to lost rental income and, in most circumstances, to lost profits. That dynamic provides a strong incentive for Luxury Hotel operators, including Hotel Defendants here, to lower their rents to fill vacant rooms.

38.     While the Hotel Defendants knew, in theory, that if they all resisted the temptation to lower rates in order to fill rooms, they would all benefit from higher

average rents, they also knew that if they were to unilaterally adopt such a strategy for their brand they would lose "heads in beds" to competitors, who would gain market share at their expense by lowering prices to increase occupancy. Thus, absent collusion, Hotel Defendants could not unilaterally raise rents above market rates.

       **2.**   **Defendants adopt Demand360, which allows its users to exchange real-time and forward-looking occupancy data.**

39.    Demand360 was originally launched in or around 2015 by a company called Travelclick, Inc. ("Travelclick") to provide market analysis data to hoteliers. Its founding customers were Defendants Marriott, Hilton, IHG, Hyatt and Starwood—some of the largest hotel groups in the country.[4]

40.    The next year, Four Seasons also adopted Demand360 through Demand360's integration with iDeaS revenue management software. In doing so, Four Seasons announced that the market intelligence Demand360 provides is "the logical next step in the evolution of advanced revenue management. Incorporating future demand and market penetration data is essential to building a superior revenue strategy . . . The more informed the demand model is, the better the optimization of pricing and inventory for hotels."[5]

41.    In late 2017, Travelclick announced that it would be "re-launching" Demand360 to enable their customers to identify actionable demand data insights faster,

---

[4] https://www.webintravel.com/data-challenges-abound-hoteliers-travelclick-rolls-new-data-tool-demand360/.

[5] https://revenue-hub.com/demand360-enhances-revenue-management/.

recognizing that "the future-looking competitive demand data that we supply is essential to a hotel's revenue management strategy, revolutionizing how hoteliers run their businesses."[6]

42.     During its 2017 relaunch, Travelclick touted that its Demand360 Quick View interface "comes with customizable alerts so hoteliers can immediately be informed of a change in their markets, such as a major increase in their competitive sets' occupancy."[7]

43.     The following is a screenshot from the Quick View in Demand360 in July 2017:[8]

---

[6] https://www.amadeus-hospitality.com/insight/travelclick-releases-new-demand360-platform-with-customizable-alertstravelclick-releases-new-demand360-platform-with-customizable-alerts/.

[7] https://www.amadeus-hospitality.com/wp-content/uploads/sites/2/demand360-relaunch-07-12-2017.pdf.

[8] https://www.amadeus-hospitality.com/insight/travelclick-releases-new-demand360-platform-with-customizable-alertstravelclick-releases-new-demand360-platform-with-customizable-alerts/.



44. After its 2017 "re-launch," Demand360 replaced its focus on general market analysis with a focus on providing hotels with real-time future demand data via advance booking data supplied by participating hotels.[9]

45. Demand360 currently has "demand and rate insights from 44k hotels" and participants, including the Hotel Defendants and their co-conspirators, which can "[v]iew 12 months of forward-looking rate and demand data."[10]

46. Demand360 is a give-to-get platform, meaning that participants cannot access competitor data without providing their own data into the system. Participating luxury hotel chains must share twelve months of their own forward-looking occupancy

---

[9] https://www.amadeus-hospitality.com/solutions/business-intelligence/demand360/.

[10] *Id.*

14

data to the Demand360 platform either via each individual hotel's property management system, or through a centralized data warehouse. A snapshot of the Demand360 platform is shown below:



47. Before Demand360, Luxury Hotels would be competitively disadvantaged by providing their own forward-looking occupancy data to competitors, who could use

that data to price in a manner that would allow them to take market share from the sharing competitor and thereby take a higher share of the available profits.

48.    But Demand360 is not a one-way street. In return for sharing their own data, Demand360 participants are allowed to select a set of four or more competitor hotels that are located in the same or similar geographic market[11]—their "competitive set"— and receive twelve months of aggregated, forward-looking demand data from those competitor properties. As described by Travelclick Vice President Maverick Mak, "in agreeing to offer their data, they will in return get the aggregated view with what is happening with their direct competitors."[12]

49.    Because of the give-to-get requirement, each Hotel Defendant knows that by participating in Demand360, its competitors will receive access to that Defendant's own forward-occupancy data, just as that Defendant has access to its competitors' forward-occupancy data.

50.    Investors took notice. Not even a year later, in October 2018, Defendant Amadeus acquired Travelclick and its Demand360 platform for $1.52 billion.[13]

51.    Following the acquisition, Amadeus touted that the Demand360 platform was a panacea for maximizing revenues: "[t]he best performing hotels have mastered the use of forward-looking demand data to make more informed decisions that maximize

---

[11] https://www.amadeus-hospitality.com/travelclick-legal/competitive-set-policy/.

[12] https://www.webintravel.com/data-challenges-abound-hoteliers-travelclick-rolls-new-data-tool-demand360/.

[13] https://corporate.amadeus.com/en/newsroom/amadeus-completes-acquisition-of-travel-click.

their revenues and help them earn their fair share of bookings."[14] "Hoteliers that use this powerful information understand that educated guesswork has been replaced by real, hard data from actual future bookings in their market."[15]

52. Hearing that clarion call, the remaining Hotel Defendants each adopted Demand360 such that, during the Relevant Period, each of the Hotel Defendants used Demand360 data to obtain their competitors' non-public future occupancy data and use this information to set supracompetitive rates.

53. Some of the Hotel Defendants currently access Demand360 through a separate Amadeus product called RevenueStrategy360. RevenueStrategy360 is a combination of Demand360 and Amadeus's Rate360 product, which is an extensive database of real-time, forward-looking rate data. In describing Rate360, Amadeus said that "Rate360 provides sanctioned rate data rather than a simple site-scraping, so you can rely on its accuracy in setting your own rates."[16] Amadeus further stated that the benefit of such sanctioned future rate data allows one to "identify compression and opportunities to maximize . . . average daily rate (ADR)."[17]

54. Tellingly, Mak explained that outside of the United States, hotels were hesitant to adopt Demand360 both due to belief that Demand360's functionality is illegal

---

[14] Amadeus, *Five Ways Forward-Looking Demand Data Can Boost Your Hotel's Revenue*, *available at* https://www.amadeus-hospitality.com/resources/five-ways-forward-looking-demand-data-can-boost-your-hotels-revenue.

[15] *See id.*

[16] https://www.amadeus-hospitality.com/wp-content/uploads/sites/2/Rate360.pdf

[17] *Id.*

and due to hesitancy in sharing their own forward-looking occupancy data with competitors.[18]

### 3. Defendants' information exchange through Demand360 allows them to avoid competition and raise prices above the competitive level.

55. The purpose and effect of the Hotel Defendants' access to their competitors' nonpublic demand data through Demand360, coupled with their access to their competitors' future rate data through RevenueStrategy360, is to allow the Hotel Defendants to increase their prices of Luxury Hotel Rooms.

56. Amadeus freely and repeatedly admits this. First, its promotional video for RevenueStrategy360 says that one of the benefits of the service is so that customers can:[19]



In other words, the point of the scheme is to determine when Hotel Defendants are not charging their clients enough and to raise rates to achieve "parity" with their ostensible competition.

57. Second, Amadeus's Director of Business Intelligence Success Management Deni Popluharova explained in an online video with Hyatt employees called "Best

---

[18] Yeoh Siew Hoon, *Data challenges abound for hoteliers – TravelClick rolls out new data tool Demand360,* WIT (April 2, 2015), *available at* https://www.webintravel.com/data-challenges-abound-hoteliers-travelclick-rolls-new-data-tool-demand360/.

[19] https://www.youtube.com/watch?v=E_DCFi7jNXo at 1:17.

practices in Demand360+" that the Demand360 Occupancy Index indicates when a hotel is getting "more than fair share" and "less than fair share."[20] These comments about "fair share" only make sense in a market where supposed competitors are actually not competing.

58.     Third, Amadeus has explained that Demand360 data allows hotels to keep rates high when it knows its competitors are at high occupancy, explaining "[i]f you know the market will sell out because there is a big event in town or a holiday weekend and you are pacing behind your competitive set, the answer could be to hold your rate. Once your competitors sell out, you will be able to drive high ADR [average daily rate] business as the only available hotel."[21]

59.     This pricing strategy would be irrational without knowledge of the non-public forward occupancy data Amadeus provides through Demand360. Indeed, without knowledge of competitors' non-public future demand and occupancy, a hotel would lower its rate to gain market share.

60.     The strategy is especially effective at increasing rates for group bookings. By looking at competitor occupancy data, a Luxury Hotel can determine whether competitors will be able to accommodate a customer seeking to rent not a single room, but a large block of rooms—demand often associated with weddings, conventions, and

---

[20] https://www.amadeus-hospitality.com/hyatt-business-intelligence/ at 13:20–13:55, 17:32–35.

[21] Amadeus, *Five Ways Forward-Looking Demand Data Can Boost Your Hotel's Revenue*, *available at* https://www.amadeus-hospitality.com/resources/five-ways-forward-looking-demand-data-can-boost-your-hotels-revenue.

other large events for which rooms are reserved ahead of time—and raise prices for the whole block if no competitors can offer a block of the requisite size.

61. Even before Amadeus bought the product, Travelclick touted precisely this ability to increase group travel rates in its pitch for why luxury hotels should adopt Demand360. Armed with knowledge of competitors' high occupancy, a hotel providing a quote for a group can "quote a higher ADR for this group, since the competitive set will likely not take the business."[22]

62. Demand360 therefore has the effect of raising prices throughout the market for Luxury Hotel Rooms.

### 4. Economic Analysis Confirms the Anticompetitive Effect of Defendants' Scheme

63. Demand360's adoption had a noticeable impact on pricing in the industry. While the Average Daily Rate ("ADR") for Luxury Hotel Rooms gradually increased year-over-year prior to 2020, it remained below the average occupancy rate. However, following the adoption of Demand360, this relationship inverted and ADR spiked to *above* the level of room occupancy, continuing to increase even as occupancy rates declined:

---

[22] Travelclick Demand360, Web Archive dated Jan. 29, 2018, *available at* https://web.archive.org/web/20180129130318/https://www.travelclick.com/demand360.html.



64.     Likewise, revenue per available room ("RevPAR") showed a similar change during the Relevant Period, where RevPAR increased despite lower occupancy:



65.     Indeed, the descriptive relationship between ADR and Occupancy increased in strength across almost all markets once Hotel Defendants began to use Demand360, and increased in strength again in the 2020-present period.

66.     Revenue of Luxury Hotels also increased during the Relevant Period despite lower occupancy.

67.     In fact, between 2019 and the present, both in the U.S. overall and in eight sample geographic markets—Los Angeles, Minneapolis, Nashville, Seattle, Chicago, Hawaii, Miami, and New York—ADR increased significantly despite a *decrease* in Luxury Hotel Room occupancy during this period as shown below:

22

| MARKET | YEAR | Average ADR | Change in ADR | Average Occupancy | Change in Occupancy |
|--------|------|-------------|---------------|-------------------|---------------------|
| Los Angeles | 2019 | $ 393.18 | | 78.32% | |
| Los Angeles | 2023 | $ 440.91 | **12.14%** | 69.27% | **-11.55%** |
| Minneapolis | 2019 | $ 194.00 | | 65.32% | |
| Minneapolis | 2023 | $ 224.68 | **15.81%** | 55.46% | **-15.09%** |
| Nashville | 2019 | $ 279.65 | | 77.45% | |
| Nashville | 2023 | $ 347.71 | **24.34%** | 69.16% | **-10.71%** |
| Seattle | 2019 | $ 260.80 | | 80.77% | |
| Seattle | 2023 | $ 302.11 | **15.84%** | 65.12% | **-19.38%** |
| Chicago | 2019 | $ 258.28 | | 71.30% | |
| Chicago | 2023 | $ 295.83 | **14.53%** | 63.79% | **-10.54%** |
| Hawaii | 2019 | $ 563.77 | | 76.44% | |
| Hawaii | 2023 | $ 839.06 | **48.83%** | 59.53% | **-22.13%** |
| Miami | 2019 | $ 331.34 | | 71.07% | |
| Miami | 2023 | $ 434.01 | **30.99%** | 64.37% | **-9.42%** |
| NYC | 2019 | $ 419.63 | | 80.60% | |
| NYC | 2023 | $ 526.02 | **25.35%** | 74.38% | **-7.72%** |
| USA | 2019 | $ 293.18 | | 72.88% | |
| USA | 2023 | $ 377.79 | **28.86%** | 66.92% | **-8.17%** |



68.     The increases in ADR while occupancy was down within the U.S. market for Luxury Hotel Rooms and within eight sample geographic markets is a direct result of Defendants' conspiracy and is not explained by market forces.

69.     As shown below, during the Relevant Period, increases in prices for Luxury Hotel Rooms far exceeded inflation during the Relevant Period:



### B.  Relevant markets

#### 1.  The relevant product market is the market for Luxury Hotel Rooms.

70.     The relevant product market is the market for the rental of Luxury Hotel Rooms.

71.     Luxury Hotels Rooms are defined as rooms in Luxury Hotels, which are generally five-star hotels. Consumers do not consider other forms of short-term lodging, such as short-term property rentals on platforms such as Airbnb or Vrbo, to compete with hotels, let alone Luxury Hotels, because short-term property rentals do not offer the amenities of Luxury Hotels, such as housekeeping services, restaurants and bars, spa and fitness services, and concierge services.

25

72.     The star-rating system, which categorizes hotels on a scale of one-to-five stars, depending on the characteristics of a hotel, is widely used in the hospitality industry and understood by travelers. Because of the widespread familiarity with the star-rating system, popular travel-booking websites, such as Expedia, allow users to filter hotel-search results by star rating, among other characteristics. Upon information and belief, consumers of Luxury Hotel Rooms often limit search results to 5-star properties when searching for Luxury Hotels.

73.     Travelers recognize Luxury Hotels as a distinct market. Luxury Hotels set themselves apart from other forms of lodging by their recognizable brands, high service standards, on-site dining, high-quality linens and furnishings, and locations in high-demand areas.

74.     Industry publications also recognize Luxury Hotels Rooms as a separate and distinct market from other hotel rooms. For example, market research and analysis firm STR, owned by Costar Group, Inc., provides market analysis and data specific to the "Luxury" segment.

75.     The following hotel chains owned and/or operated by the Defendants or their co-conspirators are classified as Luxury in STR's 2023 Chain Scales listing:

| Defendant or Co-Conspirator | Luxury Hotel Brand |
|---|---|
| Accor | 21c Museum Hotels |
| Accor | Raffles |
| Accor | Sofitel |
| Accor | Fairmont |
| Accor | SLS |
| Accor | Mondrian |
| Dorchester Collection Ltd. | Dorchester Collection |

| Defendant or Co-Conspirator | Luxury Hotel Brand |
|---|---|
| Hilton | Waldorf-Astoria |
| Hilton | LXR |
| Hilton | Conrad |
| Hongkong and Shanghai Hotels Limited | Peninsula Hotels |
| Hyatt | Park Hyatt |
| Hyatt | Andaz |
| Hyatt | Alila |
| Hyatt | Miraval |
| Hyatt | Destination by Hyatt |
| Hyatt | Unbound Collection |
| Hyatt | Grand Hyatt |
| Hyatt | Thompson Hotels |
| IHG | InterContinental |
| Indian Hotels Company, Limited | Taj Hotels |
| Loews | Loews |
| Marriott | 1 Hotels |
| Marriott | Ritz Carlton |
| Marriott | St. Regis |
| Marriott | The Luxury Collection |
| Marriott | W Hotels |
| Marriott | Edition |
| Marriott | Bulgari Hotels & Resorts |
| Marriott | JW Marriott |
| The Four Seasons | The Four Seasons |

76.     The Defendants recognize Luxury Hotel Room rentals as a distinct market.

For example, Defendant Hyatt describes its various brands on its website. It characterizes

Park Hyatt, one of its top luxury brands as, "[f]eaturing Michelin-starred dining, world-

renowned art, and personalized care to match," where guests can "[e]njoy luxurious

accommodations and exceptional touches …."[23] Similarly, for its Andaz luxury brand, it

claims that "every feature of Andaz hotels is designed to give [the traveler] the best, most

---

[23] https://world.hyatt.com/content/gp/en/landing/brand-explorer-award.html (last visited Feb. 24, 2024).

authentic taste of [their] locale."[24] Contrast this with how Hyatt describes Hyatt House, a midscale, non-luxury brand, as "a casual environment that reminds you of home."[25]

77.     Similarly, Defendant Marriott describes new properties under its "5-star luxury" brand, Ritz-Carlton, as offering "[b]oundary-pushing architecture, innovative amenities, intriguing destinations — all with legendary Ritz-Carlton service and attention to detail."[26] The headline on the webpage it dedicates to its St. Regis luxury brand reads "The Best Address." Marriott describes this brand as, "Where Indulgence Meets Sophistication."[27] In contrast, it describes its non-luxury brand, Fairfield by Marriott, as being "equipped with flexible workspaces, free Wi-Fi, and a calming design to help you stay focused."[28]

78.     The hospitality industry overall recognizes the same hotel market segments as STR, including the Luxury segment. Research firm, Statista, for example, published a report on "Hotels in the United States," in which it broke down the following segments of hotels: Luxury, Upper Upscale, Upscale, Upper Midscale, Midscale, and Economy. While it acknowledged that hotel classifications are somewhat "blurry," it also classified the following brands, most of which are owned by the Defendants, as "Luxury" hotels: Waldorf-Astoria (Hilton), Ritz-Carlton (Marriott), Four Seasons, Grand Hyatt, Luxury

---

[24] *Id.*

[25] *Id.*

[26] https://www.ritzcarlton.com/ (last visited Feb. 24, 2024).

[27] https://st-regis.marriott.com/ (last visited Feb. 24, 2024).

[28] https://fairfield.marriott.com/ (last visited Feb. 24, 2024).

Collection (Marriott), W (Marriott), Conrad (Hilton), JW Marriott, Loews, Fairmont (Accor), and InterContinental (IHG).

79.     Third parties also distinguish Luxury Hotels from lodging in other segments.

80.     Because of the distinctive features of Luxury Hotels, a hypothetical monopolist in the Luxury Hotel market could profitably impose a small but significant and non-transitory increase in price (5-10%) without losing enough business to other forms of lodging to make such an increase unprofitable.

81.     The market for Luxury Hotel Rooms is analogous to the market for luxury consumer goods, in that customers of both categories are seeking a product that has specific attributes above and beyond the product's utility.

82.      In other contexts, antitrust enforcers have recognized that luxury brands can constitute a distinct submarket. For example, in a 2011 analysis of the merger of luxury consumer goods brands Bulgari and LVMH Moët Hennessy – Louis Vuitton Group, the European Commission confirmed the existence of a luxury product market, explaining that "[t]he market investigation conducted in the present case confirmed the Commission previous' findings that luxury products should be distinguished from mass market goods, as they do not share the same characteristics."[29] It found that luxury goods

---

[29] https://ec.europa.eu/competition/mergers/cases/decisions/m6212_461_2.pdf.

were "characterized by relatively high prices, rich creative content and are marketed under a prestige trademark."[30]

83. Consumers of Luxury Hotel Rooms are looking for top notch service, in-room dining, concierge services, luxurious accommodations with larger rooms and/or suites, high-end toiletries, and features such as on-site dining, spa or resort amenities, or specific geographic attributes (such location near a beach, tourist attraction, or business district).

84. As one example of the service found in the Luxury Hotel market but absent in other lodging segments, the Ritz-Carlton (a Marriott brand) encourages its employees to use a budget of up to $2,000 per customer to solve a guest issue.[31] While this budget may seem extravagant, it is a drop in the bucket in comparison to the lifetime value of a Ritz customer, which it has valued at $250,000.[32]

> **2. The relevant geographic markets are cities or metropolitan areas within the United States.**

85. Amadeus operates a nationwide business with hotel clients spread throughout the country. Consumers throughout the country are impacted by the Hotel Defendants' exchange of information through their use of Amadeus's Demand360 platform.

---

[30] *Id.*

[31] https://www.forbes.com/sites/micahsolomon/2015/01/15/the-amazing-true-story-of-the-hotel-that-saved-thomas-the-tank-engine/?sh=6cc0d8e9230e.

[32] https://www.ey.com/en_sk/private-business/how-to-unlock-business-growth-by-putting-customers-at-the-center.

86.     Consumers of Luxury Hotel rooms are generally looking for lodging in a specific location, usually tied to a trip that the consumer is taking to that region that necessitates accommodation. Therefore, there are specific metropolitan markets for Luxury Hotels.

87.     Consumers in a particular city do not consider Luxury Hotels in other cities as adequate substitutes for Luxury Hotels in the city they are seeking. In short, a consumer visiting Miami will not consider a Luxury Hotel room in New York to be an adequate substitute.

88.     Defendants' scheme harmed competition in at least the following cities or geographic areas, each of which comprise a separate and distinct relevant regional geographic market under any potential Rule of Reason analysis. The forty-seven cities or geographic areas set forth below each constitute a relevant geographic market (collectively, the "Relevant Geographic Markets").

89.     **Tucson, Arizona** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hyatt, Loews, Omni, and Marriott, have branded Luxury Hotels in that market.

90.     **Phoenix and Scottsdale, Arizona** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hilton, Hyatt, Omni, Four Seasons, and Marriott, have branded Luxury Hotels in that market.

91.     **Los Angeles, California** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hilton, Hyatt, IHG, Loews, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

92. **Orange County, California** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hilton and Marriott, have branded Luxury Hotels in that market.

93. **San Francisco Bay Area, California** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hyatt, IHG, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

94. **Napa Valley, California** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hyatt, and the Four Seasons, have branded Luxury Hotels in that market.

95. **Palm Springs, California** constitutes a relevant geographic market. Multiple Hotel Defendants, including Marriott and Omni, have branded Luxury Hotels in that market.

96. **San Diego, California** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hyatt, IHG, Loews, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

97. **Santa Barbara, California** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hyatt, Marriott, and the Four Seasons, have branded Luxury Hotels in that market.

98. **Lake Tahoe, California** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hyatt and Marriott, have branded Luxury Hotels in that market.

99. **Santa Monica, California** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor and Hilton, have branded Luxury Hotels in that market.

100. **San Jose, California** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hyatt and the Four Seasons, have branded Luxury Hotels in that market.

101. **Monterey, California** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hyatt and IHG, have branded Luxury Hotels in that market.

102. **Denver, Colorado** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hyatt, Marriott, Omni and the Four Seasons, have branded Luxury Hotels in that market.

103. **Vail, Colorado** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hyatt, Marriott, and the Four Seasons, have branded Luxury Hotels in that market.

104. **Washington, D.C.** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hilton, Hyatt, IHG, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

105. **Fort Lauderdale, Florida** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hilton, Marriott, and the Four Seasons, have branded Luxury Hotels in that market.

106.  **Jacksonville, Florida** constitutes a relevant geographic market. Multiple Hotel Defendants, including Marriott and Omni, have branded Luxury Hotels in that market.

107.  **Miami, Florida** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hyatt, IHG, Loews, Marriott, and the Four Seasons, have branded Luxury Hotels in that market.

108.  **Orlando, Florida** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hilton, Loews, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

109.  **Tampa Bay, Florida** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hyatt and Marriott, have branded Luxury Hotels in that market.

110.  **Atlanta, Georgia** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hilton, Hyatt, IHG, Loews, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

111.  **Savannah, Georgia** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hyatt and Marriott, have branded Luxury Hotels in that market.

112.  **Hawaii** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hilton, Hyatt, Marriott, and the Four Seasons, have branded Luxury Hotels in that market.

113.     **Chicago, Illinois** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hilton, Hyatt, IHG, Loews, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

114.     **Indianapolis, Indiana** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hilton, IHG, Omni and Marriott, have branded Luxury Hotels in that market.

115.     **Louisville, Kentucky** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor and Omni, have branded Luxury Hotels in that market.

116.     **New Orleans, Louisiana** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hilton, Hyatt, IHG, Loews, Marriott, and the Four Seasons, have branded Luxury Hotels in that market.

117.     **Boston, Massachusetts** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, IHG, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

118.     **Twin Cities (Minneapolis & St. Paul), Minnesota** constitutes a relevant geographic market. Multiple Hotel Defendants, including IHG, Loews, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

119.     **St. Louis, Missouri** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Loews, Marriott, and the Four Seasons, have branded Luxury Hotels in that market.

120. **Kansas City, Missouri** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hyatt, IHG, and Loews, have branded Luxury Hotels in that market.

121. **Charlotte, North Carolina** constitutes a relevant geographic market. Multiple Hotel Defendants, including Marriott and Omni, have branded Luxury Hotels in that market.

122. **Las Vegas, Nevada** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hilton, IHG, Marriott, and the Four Seasons, have branded Luxury Hotels in that market.

123. **New York, New York** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hilton, Hyatt, IHG, Loews, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

124. **Oklahoma City, Oklahoma** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hyatt and Omni, have branded Luxury Hotels in that market.

125. **Cleveland, Ohio** constitutes a relevant geographic market. Multiple Hotel Defendants, including IHG and Marriott, have branded Luxury Hotels in that market.

126. **Philadelphia, Pennsylvania** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hyatt, Loews, Marriott, and the Four Seasons, have branded Luxury Hotels in that market.

127. **Pittsburgh, Pennsylvania** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor and Omni, have branded Luxury Hotels in that market.

128. **Nashville, Tennessee** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hilton, Hyatt, Loews, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

129. **Austin, Texas** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hyatt, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

130. **Houston, Texas** constitutes a relevant geographic market. Multiple Hotel Defendants, including IHG, Marriott, Omni, and the Four Seasons, have branded Luxury Hotels in that market.

131. **Dallas/Fort Worth, Texas** constitutes a relevant geographic market. Multiple Hotel Defendants, including Accor, Hyatt, IGH, Loews, Omni, and Marriott, have branded Luxury Hotels in that market.

132. **San Antonio, Texas** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hyatt, Omni, and Marriott, have branded Luxury Hotels in that market.

133. **Seattle, Washington** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hilton, Hyatt, IHG, Marriott, and the Four Seasons, have branded Luxury Hotels in that market.

134.   **Salt Lake City, Utah** constitutes a relevant geographic market. Multiple Hotel Defendants, including Hilton and Marriott, have branded Luxury Hotels in that market.

### 3. Defendants possess market power in the relevant markets.

### a. The relevant markets are highly concentrated.

135.   A few participants dominate the market for Luxury Hotel Rooms, and Defendants and their co-conspirators have significant concentration in the market for Luxury Hotel Rooms in the U.S. overall, and within each of the Relevant Geographic Markets.

136.   Upon information and belief, the Hotel Defendants and Conspirators comprise at least 60% of the overall U.S. market for Luxury Hotel Rooms sold. In the Chicago geographic market for Luxury Hotel Rooms, the Hotel Defendants and Conspirators have over 76% market share. In the Hawaii geographic market for Luxury Hotel Rooms, the Hotel Defendants and Conspirators have over 66% market share. In the Miami geographic market for Luxury Hotel Rooms, the Hotel Defendants and Conspirators have over 42% market share. In the New York City geographic market for Luxury Hotel Rooms, the Hotel Defendants and Conspirators have over 46% market share. In the Los Angeles geographic market for Luxury Hotel Rooms, the Hotel Defendants and Conspirators have over 87% market share. In the Twin Cities (Minneapolis & St. Paul) geographic market for Luxury Hotel Rooms, the Hotel Defendants and Conspirators have over 77% market share. In the Nashville geographic market for Luxury Hotel Rooms, the Hotel Defendants and Conspirators have over 90%

market share. In the Seattle geographic market for Luxury Hotel Rooms, the Hotel Defendants and Conspirators have over 85% market share. Additional hotels within these geographic markets use Demand360, and the actual market share of hotels using Demand360 within these markets is likely to far exceed these estimates.

> **b. High barriers to entry prevent new entry into the relevant markets.**

137.    The Luxury Hotel Room market is characterized by high barriers to entry.

138.    The existence of high barriers to entry is one factor which makes markets susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the Luxury Hotels Market exist, precluding other entrants or would-be competitors from entering the market for hotels in the United States.

139.    During the Relevant Period and continuing today, substantial barriers impede entry into the Luxury Hotel Room market. A new Luxury Hotel would face costly and lengthy start-up financial investments. Entering the Luxury Hotel market necessarily requires property in highly desirable locations, which necessarily have some of the highest costs of acquisition in the world. And to be truly successful, an entrant must acquire *multiple* high-value properties to create the portfolio of luxury properties that travelers expect, which further inflates the cost of entry.

140. In addition, acquiring, building, renovating, or customizing a hotel property would require a new entrant to bear tens of millions of dollars in costs associated with property acquisition and construction or renovation of a hotel. The hotel would need to include amenities expected of a Luxury Hotel, such as a spa, fitness center, and upscale dining options, as well as high-quality furnishings, bedding, and décor. A new entrant would also need to recruit and train highly skilled staff capable of offering personalized guest service, including chefs, housekeepers, spa therapists, and concierges. A new entrant would also need to implement a marketing and advertising strategy to promote the luxury brand and develop name recognition. Additional costs would have to be spent on maintaining the hotel and keeping its amenities and offerings up-to-date to maintain its allure.

141. For example, in 2016, even though it was not a new market entrant, Defendant Four Seasons spent $120 million on just renovating its existing hotel in New York City.[33] And Defendant Hilton's Waldorf-Astoria is planning a $2 *billion* development of its Beverly Hills property.[34]

142. Reputational barriers to entry are also high. Relative to other consumers of lodging, consumers of Luxury Hotel Rooms value the consistent experiences and loyalty programs that the Defendants have taken decades to build. Thus, in addition to spending billions of dollars to acquire a portfolio of properties in desirable locations, an entrant

---

[33] https://www.myinspiredesign.com/four-seasons-hotel-new-york-unveils-transformation/.

[34] https://labusinessjournal.com/real-estate/beverly-hills-project-secures-500m-loan/.

would have to create a brand experience and loyalty program to lure travelers to its properties.

143.    Because of the high barriers to entry, there have been few significant new entrants in the Luxury Hotel Room market; new Luxury Hotel brands are often launched by existing companies in the Luxury Hotel market. For example, Starwood, which created the W Hotels and St. Regis hotels chains, launched the 1 Hotels brand in 2015.[35] The 1 Hotel in Hanalei Bay, Hawaii was recently renovated at a cost of $500 million.

144.    There have been no new entrants to the Luxury Hotel market since at least 2000. To the contrary, the relevant market has been characterized by consolidation in recent years. In 2015, Defendant Marriott acquired Starwood and its 1 Hotels, St. Regis, Luxury Collection, and W luxury brands. And in 2023, Defendant Accor acquired luxury brands Fairmont, Raffles, and Swissôtel.

145.    Defendants' use of Demand360 provides direct evidence of market power.

146.    The ability to raise and maintain supracompetitive prices is direct evidence of market power. By their successful employment of Demand360, and their ability to profitably raise prices as a result, the Defendants have directly demonstrated that they have market power.

147.    In a competitive market, occupancy rates (the percentage of a hotel's rooms that are occupied) would drive hotel room-rental rates. If a hotel had a high occupancy

---

[35] *Hawaiian eco-luxury report's $500 million facelift*, THE SYDNEY MORNING HERALD (April 7, 2023), available at https://skift.com/2015/03/26/interview-barry-sternlicht-on-the-launch-of-his-new-1hotels-brand/.

rate for a given night (in other words, if it experienced high demand for room rentals), it would charge a relatively high rental rate for available rooms, for which supply is fixed. Conversely, if a hotel experienced low occupancy for a given night, it would be expected to lower its room-rental rates to attract travelers because empty rooms are equated with lost revenue.

148.    The fact that, with the assistance of Demand360, the Defendants can circumvent the free-market forces described above indicates that they have market power in the market for Luxury Hotel Rooms.

149.    Not only could a hypothetical monopolist profitably impose price increases in the Luxury Hotel Room rental market, but the Defendants have actually done so. Relative to 2019, the last complete year before the COVID-19 pandemic, nightly room rates at Luxury Hotels (as measured by revenue per available room, or RevPAR, a standard industry metric) are significantly higher in the Relevant Geographic Markets despite the fact that occupancy rates are lower.

150.    If the Defendants did not have market power, they would not have been able to successfully implement this price increase, because consumers would have shifted to other forms of lodging, thus rendering the Defendants' price increases unprofitable.

### C. Defendants coordinated conduct provides plausible evidence that a conspiracy existed.

#### 1. Hotel Defendants engaged in parallel conduct.

151.    With the onset of the COVID-19 pandemic in March 2020, the U.S. hotel industry suffered a severe blow, hitting historical lows in occupancy and revenue.[36] The Luxury Hotel Room Market particularly faced significant challenges in the first year of the COVID-19 pandemic—experiencing an average decrease in occupancy by 57% and a revenue per available room (RevPAR) deficit of 60.6%.[37]

152.    In June 2020, McKinsey & Company reported that while "economy hotels can stay open at lower occupancy rates," "luxury hotels conservatively need occupancy rates 1.5 times greater than economy hotels."[38] As a result, "[b]etter demand and lower operating costs suggest that economy [rather than luxury hotels] will recover faster."

153.    Faced with a dire outlook and desperate to recoup such unprecedented pandemic losses, the Hotel Defendants, with the help of Defendant Amadeus, sought to use the Demand360 platform as a means to artificially increase prices for Luxury Hotels despite low demand. Therefore, going forward, Defendants operated in a coordinated manner, even when doing so was contrary to each Defendant's independent economic self-interest.

---

[36] https://tpghotels.com/the-pandemic-and-the-hospitality-industry-from-impact-to-recovery/#:~:text=The%20Luxury%20segment%20of%20the,57%25%20decrease%20in%20occupied%20rooms.

[37] *Id.*

[38] https://www.mckinsey.com/industries/travel-logistics-and-infrastructure/our-insights/hospitality-and-covid-19-how-long-until-no-vacancy-for-us-hotels.

154.    According to a 2021 statement by Katie Moro, Vice President of Data Partnerships, Hospitality at Amadeus, "One year on from the start of the pandemic . . . [n]ow more than ever, data is so critically important across an entire hotel business as it informs not only revenue potential but also marketing strategies, staffing, and occupancy profile."[39]

155.    Moro touted the benefits of forward-looking data in light of the pandemic: "As consumer confidence fluctuates with states moving in and out of phased recovery, relying on data from last week or last year to drive a future revenue strategy will not be beneficial. Because of COVID-19, there is no time in history we can compare to what is happening in the industry now."[40]

156.    In fact, in September 2020, faced with pandemic-related challenges, Defendant Accor joined other Hotel Defendants Hilton, IHG, Hyatt, Marriott, Ritz-Carlton, Four Season, and Loews, and agreed to use Demand360.[41] According to Amadeus's press release:

> As COVID-19 continues to disrupt travel around the globe, hoteliers face many challenges in running their business and planning for future. The historical references and past data they once relied on to build their revenue strategies no longer aligns with current market trends, making it more critical than ever to have access to powerful business intelligence tools. To support Accor hoteliers in successfully navigating COVID-19 and to plan for the future, the hotel group has

---

[39]https://lodgingmagazine.com/amadeus-releases-demand360-data-and-rebuilding-hospitality-report/.

[40] https://www.amadeus-hospitality.com/insight/covid-19-summer-hotel-trends/.

[41] https://amadeus.com/en/insights/press-release/accor-amadeus-partnership-business-intelligence.

expanded its strategic partnership to include the use of Demand360® . . . [and] gain insight into one year of forward-looking occupancy data to help them improve decision making, maximize distribution strategies, and increase revenue per available room (RevPAR) as well as local market share.

157.   The following month in October 2020, Defendant Hilton extended its partnership with Amadeus to use Demand360 (in addition to several other Amadeus products and services) and make Demand360 "the exclusive provider of forward-looking data integrated into Hilton's Revenue Management System (GRO)."[42] According to Amadeus's press release: "With this integration, Demand360 data provides GRO's analytics with improved visibility . . . . The result seen by the Hilton properties that recently completed the pilot integration is refined decision-making, enabling revenue improvement."[43] Amadeus once again emphasized that "[i]n challenging times for the hotel industry, having access to quality, forward-looking data is paramount."

158.   In December 2020, Defendant IHG also extended its partnership with Amadeus and renewed its use of Demand360 (in addition to several other Amadeus products and services).[44] According to Jeff Garber, Vice President, Revenue Performance & Reporting at IHG, "by extending our relationship with Amadeus, IHG and hotels that

---

[42] https://amadeus.com/en/insights/press-release/hilton-amadeus-renew-expand-exclusive-business-intelligence-partnership.

[43] *Id.*

[44] https://www.amadeus-hospitality.com/insight/ihg-business-intelligence-partnership/.

subscribe to these products, gain important insights and have access to critical data to help navigate today's recovery and plan for the future."

159. Throughout 2020, Amadeus made several "enhancements" to Demand360.[45] In particular, Amadeus introduced a new "Recovery Insight" dashboard to provide customers with "forward-looking global market data, including updates with new daily reservations received from thousands of data providers." Amadeus noted in its 2020 Global Report that the largest hotel chains "are increasingly recognizing the value of these solutions."

160. Defendants' scheme was successful. As one investment consulting firm reported, "[t]he Luxury sector began to quickly recover."[46] Luxury Hotels, including Hotel Defendants, were able to "drive ADR," causing it to increase by 28.6% over pre-pandemic levels despite occupancy "still lag[ging]."

161. Beginning approximately one year after the COVID-19 pandemic hit, prices for Luxury Hotel Rooms rose significantly during the Relevant Period when compared to pre-pandemic prices in 2019.

---

[45] https://corporate.amadeus.com/documents/en/investors/2021/annual-shareholder-meeting/amadeus-global-report-2020-eng.pdf.

[46] https://tpghotels.com/the-pandemic-and-the-hospitality-industry-from-impact-to-recovery/#:~:text=The%20Luxury%20segment%20of%20the,57%25%20decrease%20in%20occupied%20rooms.

162.    In the first nine months of 2021, the occupancy rate for Luxury Hotels in the United States was approximately 49.6%, a decrease of 31.2% from 2019. At the same time, however, the average daily rate ("ADR"), *i.e.*, the average rate paid for hotel rooms during the time period, *increased* by 10.6%:[47]

| **U.S. HOTEL PERFORMANCE BY TIER** YEAR-TO-DATE THROUGH AUG. 31, 2021 | Occupancy | Change vs. 2019 | ADR | Change vs. 2019 | RevPAR | Change vs. 2019 |
|---|---|---|---|---|---|---|
| Luxury | 49.6% | -31.2% | $335.31 | 10.6% | $166.30 | -24.0% |

163.    As discussed below, by 2022, demand for Luxury Hotels remained lower than in 2019. However, ADR for the Luxury Hotels increased significantly compared to 2019.[48]

164.    Defendant Accor reported a 4.9% decrease in its Luxury and Upscale Hotel occupancy rates in 2022 compared to 2019 in the Americas. At the same time, Accor's ADR for Luxury and Upscale Hotels in the Americas increased by 14%.[49]

165.    Defendant Hilton reported a 16.3% decrease in occupancy rate for its luxury Waldorf-Astoria Hotels in 2022 compared to 2019.[50] Meanwhile, Hilton's ADR for its

---

[47] https://www.businesstravelnews.com/Research/Hotel-Survey-Report/2021/Ext-Stay-Economy-Led-Pandemic-But-Field-Leveling-Off.

[48] https://www.costar.com/article/1014912249/luxury-hotels-continued-their-global-recovery-in-2022.

[49] Accor, FY 2022 Results Presentation (Feb. 23, 2023), p. 29, *available at* https://group.accor.com/en/finance/results-and-publications/financial-result.

[50] https://ir.hilton.com/~/media/Files/H/Hilton-Worldwide-IR-V3/quarterly-results/2023/q4-2022-earnings-release.pdf; https://ir.hilton.com/~/media/Files/H/Hilton-Worldwide-IR-V3/quarterly-results/2019/q4-2019-earnings-release.pdf.

Waldorf-Astoria Hotels increased by a staggering 45.7% in 2021 compared to just the year prior in 2020,[51] and another 7.3% increase in 2022 compared to 2021.

166.    Defendant Hilton also reported a 16.4% decrease in occupancy rate for its luxury Conrad Hotels in 2022 compared to 2019. Meanwhile, Hilton's ADR for its Conrad Hotels increased by a staggering 39.1% in 2022 compared to just the year prior in 2021, and another 9.1% increase in 2021 compared to 2020.[52]

167.    Defendant Hyatt reported a 30.9% decrease in occupancy rate for its Luxury Hotels in 2021 compared to 2019. Meanwhile, Hyatt's Luxury Hotels ADR increased by 11.8% compared to just the year prior in 2020.[53]

168.    Defendant IHG reported a 7.4% decrease in occupancy rates in 2022 compared to 2019, while its ADR increased by 8.2%.[54]

169.    Defendant Loews reported a 3.9% decrease in occupancy rates in 2022 compared to 2019, while its ADR increased by 7.5%.[55]

---

[51] https://ir.hilton.com/~/media/Files/H/Hilton-Worldwide-IR-V3/quarterly-results/2021/q4-2021-earnings-release.pdf.

[52] *Id.*

[53] https://investors.hyatt.com/files/doc_financials/2021/q4/Q4_2021-EarningsRelease-Final.pdf at p. 5; https://investors.hyatt.com/files/doc_financials/2019/q4/Q4-2019-Earnings-Release.pdf.

[54] https://www.ihgplc.com/~/media/Files/I/Ihg-Plc/investors/annual-report/annual-report-2022.pdf.

[55] https://www.ihgplc.com/~/media/Files/I/Ihg-Plc/investors/annual-report/annual-report-2022.pdf; https://loews.com/FileStore/2022-Q1---Company-Overview.pdf.

170.    Defendant Marriott reported a 9.5% decrease in occupancy rate for its North American Luxury Hotels (including Defendant Ritz-Carlton) in 2022[56] compared to 2019,[57] while Marriott's ADR increased by 16.8%.

171.    These numbers indicate that the Hotel Defendants changed their strategies in the pandemic to raise Luxury Hotel Room prices. Hotel Defendants' access to confidential, forward-looking occupancy data through their use of Demand360 allowed them to raise ADR during the COVID-19 pandemic, even despite the historically low occupancy levels stemming from the pandemic.

### 2. Well-recognized "plus factors" render it plausible that Hotel Defendants increased rents due to coordination rather than because of outside market forces.

172.    The presence of a number of factors, referred to as "plus factors" and "super plus factors," render the Luxury Hotel Rooms Market highly conducive to collusion. Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[58] "[S]uper plus factors are actions or outcomes that would almost never be observed in the absence of collusion, [such that] it is reasonable to presume that the cartel

---

[56] https://marriott.gcs-web.com/static-files/2716251f-e996-48f7-b29b-2a3c6ac3b019.

[57] https://marriott.gcs-web.com/news-releases/news-release-details/marriott-international-reports-fourth-quarter-2019-results.

[58] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

finds these conducts or outcomes important to the implementation and operation of the collusive structures."[59]

173.    Specifically, the following plus and super plus factors support an inference that the Hotel Defendants' actions constituted an unlawful, anti-competitive information-sharing scheme in the Luxury Hotels Market:

174.    **Inelastic Demand.** Elasticity of demand measures demand for a good or service in response to price. A high price elasticity means that demand will decrease sharply when prices increase. A low price elasticity means that demand will remain relatively consistent despite increases in price.

175.    Luxury Hotel Rooms have low price elasticity. This is because they cater to customers willing to pay premium prices, such as high-income travelers and business travelers, who are less sensitive to price fluctuations. Business travelers whose stays are reimbursed by their employers are particularly price insensitive.

176.    As a managing director at Bernstein explained regarding Defendant Hyatt's Luxury Hotel price increases, "they've reset all their luxury prices higher, or their rack rates have gone up a lot, because they realized that [luxury] consumer probably has always been more time poor than cash poor and could have afforded a more expensive hotel."[60]

---

[59] *Id.* at 426.

[60] https://thepointsguy.com/news/future-of-luxury-hotel-stays/.

177. **Fungibility.** Fungibility is the ability to freely exchange one product with another. Luxury Hotel Rooms are a relatively fungible product. While hotel rooms can have unique features, a luxury traveler is likely to book a certain luxury hotel offering similar amenities to another luxury hotel that is priced higher or sold out. In other words, competition among luxury hotels is primarily driven by pricing.

178. **Motive to Collude.** Defendant Amadeus provides the Hotel Defendants with a motive to conspire by advertising its Demand360 platform's ability to "Boost Your Hotel's Revenue."[61] Amadeus touts its "proprietary partnerships" that allow it to provide access to twelve months' of forward-looking occupancy data. And as described above, the unprecedented low demand due to the COVID-19 pandemic affecting the Luxury Hotels Market provided Hotel Defendants with further motive to collude, particularly with Amadeus's advertisement of the necessity of obtaining forward-looking data to drive revenue in the Luxury Hotels Market during this challenging time.

179. **Trade Associations Provide Opportunities to Collude.** Defendants are members of hotel industry trade associations and attend conferences that provide opportunities to collude. For example, the Hospitality Sales and Marketing Association International ("HSMAI"), touted as the hotel industry's "leading advocate for intelligent, sustainable revenue growth" hosts conferences attended by numerous Defendants. On June 29, 2022, for example, it hosted its Revenue Optimization Conference ("ROC") in Orlando, Florida. It was attended by executives and employees from Defendants

---

[61] https://www.amadeus-hospitality.com/solutions/business-intelligence/demand360/.

Amadeus, Accor (including representatives from the Sofitel and Fairmont brands), Hyatt, IHG, Loews, Marriott (including a representative from the 1 Hotels brand), and the Four Seasons.[62] In an article for HSMAI's blog concerning recovery from the COVID-19 pandemic, Amadeus's Vice President, Data Partnerships Katie Moro explained: "To support you in your recovery efforts, the teams at Amadeus and HSMAI have collaborated to bring you industry-leading best practices that you can consider when building, implementing, and monitoring your recovery strategy. As always, we're here to help. **Collaborating as an industry, we will recover and come back stronger than ever.**"[63]

### D. Defendants' conduct caused actual anticompetitive effects in the relevant markets.

180.    Competition is harmed when, like here, competitors with market power in concentrated markets directly exchange confidential, strategic information about current and forward-looking plans for prices and supply. Price, capacity, supply, and costs are crucial aspects of competition. Information exchanges advance competitors' ability to collude.

181.    When businesses that are competing for the same customers exchange their confidential, strategic information, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects in the market.

---

[62] https://commercial.hsmai.org/wp-content/uploads/sites/17/2022/11/2022-HSMAI-ROC-Conference-Attendee-List-1.pdf.

[63] https://americas.hsmai.org/insight/hsmai-customer-insight-occupancy-changes-segment-shifts-rate-adjustments/ (emphasis added).

182.    The Supreme Court, in *United States v. Container Corp. of America*, 393 U.S. 333, 337 (1969), explained that information exchanges among competitors in highly concentrated industries can "ha[ve] an anticompetitive effect in the industry, chilling the vigor of price competition." The Court held that such information exchanges can constitute a stand-alone violation of Section 1 of the Sherman Act. *See id.* at 335–37.

183.    Other courts have embraced that decision. As the Second Circuit explained, "'[a] number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication.'"[64] "[E]xchanges of current price information have the greatest potential of creating anticompetitive effects and have consistently been held to violate the Sherman Act."[65]

184.    The U.S. Department of Justice ("DOJ") has stated that information exchanges with direct competitors raise serious antitrust concerns:

> [T]he sharing of information related to a market in which . . . the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of

---

[64] *See Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

[65] *In re SSA Bonds Antitrust Litig.*, No. 16 Civ. 3711 (ER), 2020 WL 1445783, at *4 (S.D.N.Y. Mar. 25, 2020) (citing *Gypsum*, 438 U.S. at 441 n.16).

information relating to less competitively sensitive information.[66]

185.    The DOJ recently demonstrated a renewed focus on anticompetitive information sharing. On February 3, 2023, the DOJ withdrew antitrust policy statements that provided safe harbors for sharing pricing or cost information, concluding that the policy statements are "*overly permissive* on certain subjects, *such as information sharing*, and no longer serve their intended purposes of providing encompassing guidance to the public on relevant healthcare competition issues in today's environment."

186.    Here, Defendants' information exchanges existed for the purpose of increasing prices of Luxury Hotel Rooms above competitive levels and aiding the Hotel Defendants in abusing their market power to suppress price competition.

187.    Defendants' information exchange took place in private settings and involved the exchange of confidential, current and forward-looking information. The information was shared only among hotels participating in the information-exchanging scheme through Demand360.

188.    Further, as alleged above, Defendants' information exchange occurred in markets with characteristics that make it particularly likely that such an exchange will have anticompetitive effects, including markets with a fungible product, for which competition is price-based, inelastic demand, and relatively few sellers.

---

[66] https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf

189. As a result, as alleged above, despite a decrease in occupancy compared to 2019, prices for Luxury Hotel Rooms rose significantly during the Relevant Period, indicating an anticompetitive restraint on supply in the Luxury Hotels Market.

190. There is no legitimate procompetitive justification for Defendants' conduct.

191. Defendants' information sharing practices violate even a government policy—the Health Care Policy Statements—that the DOJ deemed "too permissive," demonstrating the particularly egregious nature of the conduct being challenged here.

192. Defendants, through their use of Demand360 to exchange non-public information, including proprietary forward-looking demand data, have caused direct anticompetitive effects across the nation and in each regional submarket in the form of higher prices.

## CLASS ACTION ALLEGATIONS

193. Plaintiff brings this action on behalf of himself and as a class action under the provisions of Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of members of the following Class:

> All persons in the United States who rented a Luxury Hotel Room from one or more Defendants between March 1, 2020 and the Present in any of the Relevant Geographic Markets. Excluded from the Class are Defendants; their officers, directors, management, employees, subsidiaries, affiliates, and coconspirators. Also excluded are any federal, state, or local governmental entities, any judicial officers presiding over this action; their law clerks and spouses; any persons within three degrees of relationship to those living in the judicial officers' household; and the spouses of all such persons.

194. Members of the Class are so numerous that joinder is impracticable as the class is expected to include hundreds of thousands of class members. Further, members of the Class are readily identifiable from information and records in Defendants' possession.

195. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendants.

196. Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of members of the Class.

197. Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions involving group boycotts and conspiracy claims.

198. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

    a.    Whether Defendants exchanged competitively sensitive information;

    b.    Whether Defendants engaged in a combination or conspiracy to fix, raise, maintain or stabilize the prices for Luxury Hotel Rooms.

    c.    The scope and duration of the alleged conspiracy;

d. Whether such combination or conspiracy violated the federal antitrust laws;

e. Whether the conduct of Defendants and their co-conspirators, as alleged in this complaint, caused injury to the Plaintiff and other members of the Class;

f. Whether Defendants caused Plaintiff and the Class to suffer damages in the form of overcharges on Luxury Hotel rates;

g. The appropriate class-wide measure of damages;

h. Appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

199. Class-action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

200. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

201. Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

202.    Plaintiff has defined members of the Class based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period and Relevant Geographic Markets.

## COUNT I

### Unlawful Contracts, Combinations, and/or Conspiracies in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

203.    Plaintiff repeats the allegations set forth above, as if fully set forth herein.

204.    Beginning at a time currently unknown to Plaintiff, but at least as early as March 1, 2020 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

205.    The contract, combination, or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

206.    Defendants' anticompetitive conduct had the following effects, among others:

      a.    Price competition has been restrained or eliminated with respect to Luxury Hotel Rooms;

      b.    The prices of Luxury Hotel Rooms have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c.      Members of the Class have been deprived of free and open competition; and

d.      Members of the Class paid artificially inflated prices for Luxury Hotel Rooms.

207.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge paid by the Class, such that the economic harm to Plaintiff and the Class can be quantified.

208.    The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to raise, fix, or maintain the price of Luxury Hotel Rooms and, as a direct and foreseeable result, Plaintiff and the Class paid supracompetitive prices for Luxury Hotel Rooms during the Class Period.

209.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for Luxury Hotel Rooms than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

210.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

211.    Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Luxury Hotel Rooms in the United States.

212.    Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class of all others similarly situated, respectfully requests:

A.      That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, that Plaintiff's counsel of record be appointed as Class counsel, and that the Court direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      That the unlawful conduct, conspiracy, or combination described herein be adjudged and decreed to violate Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1);

C.      That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged in the Complaint, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect under Section 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing the exchange of competitively sensitive information between and among

Defendants, causing anticompetitive effects without sufficient procompetitive justifications;

E. The Court grants Plaintiff and members of the Class all other equitable relief in the nature of disgorgement, restitution, and/or the creation of a constructive trust to remedy the Hotel Defendants' unjust enrichment;

F. The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

G. The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


DATED: March 1, 2024        By: */s/ Steven M. Berezney*
                                       Steven M. Berezney (N.D. Ill. 6281020)
                                       KOREIN TILLERY LLC
                                       505 N. 7th Street, Suite 3600
                                       St. Louis, MO 63101
                                       Telephone: (314) 241-4844
                                       Facsimile: (314) 241-1854
                                       sberezney@koreintillery.com

Pamela I. Yaacoub (N.D. Ill. 6327801)
KOREIN TILLERY LLC
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751
pyaacoub@koreintillery.com

Vincent Briganti
Christian Levis
Nicole A. Veno
Claire Noelle Forde
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
nveno@lowey.com
nforde@lowey.com

Geoffrey H. Kozen (N.D. Ill. 0398626)
Ryan Marth
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
rmarth@RobinsKaplan.com
gkozen@RobinsKaplan.com

*Attorneys for Plaintiff and the Proposed Class*