**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RYAN SEGAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 24-cv-1783 |
| v. | ) | |
| | ) | Honorable Joan B. Gottschall |
| AMADEUS IT GROUP, S.A., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Ryan Segal filed this Sherman Act, 15 U.S.C. §§ 1 *et seq.*, antitrust suit in 2024 as a proposed national class action against several owners of luxury hotel brands, such as Hyatt, Hilton, and Marriott, and two companies referred to collectively as Amadeus: Amadeus IT Group, S.A. ("Amadeus S.A."), a Spanish corporation, and Amadeus Hospitality Americas Inc., a Delaware corporation headquartered in New Hampshire. *See* Third Am. Compl. ¶¶ 31–40, Dkt. No. 144 (listing defendants). Last year, this court dismissed Segal's second amended complaint for failure to state a claim and granted him leave to file a third amended complaint. 2025 WL 963751, at *7 (Mar. 31, 2025) (Dkt. No. 143) [hereinafter Segal I]. Segal did so. Like the parties, the court uses the acronym TAC to refer to Segal's third amended complaint.

Two motions to dismiss Segal's TAC are before the court. *See* Motions to Dismiss, Dkt. Nos. 152, 154. All defendants join in arguing that the TAC fails to state a claim under § 1 of the Sherman Act and that the TAC's new allegations do not cure the defects this court found in the second amended complaint. *See* Amadeus S.A. Mem. Supp. Mot. to Dismiss 9–10, Dkt. No. 155. Amadeus S.A. seeks dismissal on the alternative ground that the court lacks personal jurisdiction over it. *Id.* at 4–8. For the reasons discussed herein, the court dismisses the TAC for failure to state a claim under § 1 of the Sherman Act.

## I. BACKGROUND

Since this case comes before the court on a motion to dismiss a complaint for failure to state a claim, the court must accept the TAC's well-pleaded factual allegations as true and draw all reasonable inferences in plaintiff's favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Yash Venture Holdings, LLC v. Moca Fin., Inc.*, 116 F.4th 651, 653 (7th Cir. 2024).[1] For the most part, the TAC replicates the factual and substantive allegations made in Segal's prior complaints. The opinion dismissing Segal's second amended complaint recites the alleged facts in detail. *See* Segal I, 2025 WL 963751, at *1–3. To provide context, a synopsis follows.

Segal's claim centers on hotel defendants' use of Amadeus' Demand360 software platform.[2] When they signed up for Demand360, each hotel defendant agreed to provide twelve months of forward-looking, non-public hotel room occupancy data via Demand360, as well as two projected sales metrics: expected average daily rate (ADR), apparently referring to the average price charged for a hotel room, and a hotel's revenue per available room (RevPAR). *See* TAC ¶ 16. Segal describes this as a "give to get" exchange. TAC ¶ 3; *see also* TAC ¶¶ 9–19. In exchange for providing its hotels' occupancy data, ADR, and RevPAR, hotel defendants received access to Demand360's "competitive sets" feature. *See* TAC ¶¶ 47–58. This feature allows a subscriber to create up to three aggregated groups of four or more hotels "located in the same or similar geographic market" and view twelve months' worth of aggregated room occupancy and sales figures for the hotels in the set. *See* TAC ¶¶ 47, 55–58 (quotation in ¶ 55).

In allegations that were not made in his prior complaints, Segal alleges that the aggregated information Demand360 provides can be used by hotel defendants to identify specific hotels by creating overlapping competitive sets and isolating a given hotel. The TAC does not

---

[1] Hotel defendants attached several exhibits to their motion to dismiss the TAC, and Segal has countered with his own exhibits in response. Because the court's ruling would be the same whether or not these exhibits are considered, the court need not determine whether they are referenced in the TAC and sufficiently central to Segal's claims to warrant incorporating them. *See generally Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 663 (7th Cir. 2022); *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

[2] Some hotel defendants use Demand360 with other Amadeus products into which it is integrated. *See* TAC ¶ 8 & n.1. No party argues that Demand360's integration affects the analysis.

plead that any defendant has done so. *See* TAC ¶¶ 57–58. "The purpose and effect of the Hotel Defendants' access to their competitors' nonpublic current and future demand, ADR, and RevPAR data through Demand360, . . . [is] to allow the Hotel Defendants to increase and stabilize their prices of Luxury Hotel Rooms above the competitive level." TAC ¶ 65; *see also* TAC ¶¶ 71–87.

Segal defines the relevant product market as the "market for the rental of Luxury Hotel Rooms." TAC ¶¶ 121–35 (quotation in ¶ 121). The TAC cites industry publications and other sources and asserts that amenities, location, and service quality distinguish the luxury hotel segment in the minds of consumers, and such rooms "are generally [rooms in] five-star hotels." TAC ¶ 122; *see* TAC ¶¶ 123–30. Geographically, the TAC divides the country into "specific metropolitan markets" for luxury hotel rooms, each of which is alleged to be a distinct geographic market in which defendants have harmed competition. TAC ¶ 137; *see also* TAC ¶¶ 136–85. The TAC identifies forty-six such geographic markets and pleads that hotel defendants collectively account for approximately sixty percent of luxury hotel room rentals nationwide. *See* TAC ¶¶ 139–87; *see also* TAC ¶¶ 188–208 (alleging further characteristics of the luxury hotel market, such as low elasticity of demand, significant barriers to entry, and low price sensitivity among potential guests).

The second amended complaint was unclear about whether Segal intended to advance a hub-and-spoke conspiracy claim, an information-sharing claim, or another theory of recovery under § 1 of the Sherman Act. *See* Segal I, 2025 WL 963751, at *5–6 & n.3. The TAC leaves no room for doubt. Segal pleads a single count under § 1, alleging that defendants shared non-public information in violation of *United States v. Container Corp. of America*, 393 U.S. 333 (1969), and cases applying and interpreting it. TAC ¶¶ 209–22, 233–42 (repeatedly citing *Container Corp.*, 393 U.S. at 337, and *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.)).

## II. ANALYSIS

"The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition." *Agnew v. NCAA*, 683 F.3d 328, 334–35 (7th Cir. 2012) (citing *Banks v. NCAA*, 977 F.2d 1081, 1087 (7th Cir. 1992)). Section 1 of the Sherman Act makes it unlawful for any person to "make any contract or engage in any combination or conspiracy" in restraint of trade or commerce. 15 U.S.C. § 1. To state a claim under § 1 of the Sherman Act, Segal must plead three elements: "(1) that defendants had a contract, combination, or conspiracy ('an agreement'); (2) that as a result, trade in the relevant market was unreasonably restrained; and (3) that [he was] injured." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) (citing *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993); other citation omitted).

Defendants contend that the TAC fails adequately to allege each of those elements. They add, regarding the second element, that the TAC does not plausibly identify a relevant market. As occurred with the second amended complaint, the court reaches only the question of whether the TAC plausibly alleges a contract, combination, or conspiracy within the compass of § 1. *See* Segal I, 2025 WL 963751, at *5.

### A. The Plausibility Standard

In analyzing the TAC's sufficiency, this court applies the plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), as it has been explicated in many subsequent cases, chief among them being the Supreme Court's 2009 decision in *Iqbal*. The plausibility standard draws upon Federal Rule of Civil Procedure 8(a)(2), which provides that every complaint must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 663. *Twombly* holds that Rule 8(a)(2) requires a complaint to contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Shorn of legal conclusions masquerading as facts, a complaint's well-pleaded

4

"[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* (citation omitted).

*Twombly* applied the plausibility standard to a § 1 claim like the one Segal brings here: "We hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. Furthermore, in the context of a § 1 claim, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 556–57; *see, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 790 (N.D. Ill. 2017). "[P]roceeding to antitrust discovery can be expensive," observed the Court, and "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.7 (1983)). As the Supreme Court later explained, determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Twombly*, 550 U.S. at 568–70.

## B. Application to the Third Amended Complaint

Beginning with what is not at issue, this court ruled that the second amended complaint failed to state a § 1 claim premised on (1) a direct agreement among defendants, and (2) a hub-and-spoke conspiracy theory. *Segal I*, 2025 WL 963753, at *4–5. The TAC makes no effort to replead either of those claims. Indeed, Segal does not contend that the TAC pleads a plausible claim that hotel defendants reached an express, implied, tacit, or similar agreement to fix prices or otherwise restrain trade. *See* Resp. Opp'n Hotel Mot. to Dismiss 6–10, Dkt. No. 162. Rather,

5

he argues that the agreement element of his § 1 claim is satisfied by the sharing of non-public information.  He makes this contention explicitly: "Critically, Segal is *not* required to allege that Defendants agreed to fix prices or reduce output; the exchange of information establishes the requisite agreement."  *Id.* at 6.  As sole support for this legal proposition, Segal cites *Container Corp. Id.*

*Container Corp.* involved the exchange of non-public price information under a reciprocal arrangement among market participants, whereby each agreed to furnish, upon the request of any other member of the cartel, the last price at which a good was sold or quoted to a customer.  *See Container Corp.*, 339 U.S. at 335–36.  The Supreme Court held that the "conspiracy or concerted action" element of the plaintiff's § 1 claim was satisfied by allegations that the defendants "usually furnished the [pricing] data [requested by a co-defendant] with the expectation that it would be furnished reciprocal information when it wanted it."  *Id.* at 335 (footnote omitted).

As explained in a case that features prominently in both sides' briefing,

> [I]n *United States v. Citizens & Southern National Bank*, [the Supreme Court clarified] that "the dissemination of price information is not itself a *per se* violation of the Sherman Act."  In *United States v. United States Gypsum Co.*, the Court explained its reasoning: "The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive."  438 U.S. 422, 441 (1978).

*Todd*, 275 F.3d at 199 (citation modified).

The Seventh Circuit read and applied *Container Corp.* in accordance with these principles in *Omnicare*.  *Omnicare*, 629 F.3d at 705.  The *Omnicare* plaintiff brought several § 1 Sherman Act claims, including a *Container Corp.* information-sharing claim that, during merger negotiations, two competitors exchanged non-public pricing information.  *Id.* at 711.  Citing cases applying *Container Corp.*, the Seventh Circuit stated: "Information exchange can help support an inference of a price-fixing agreement, but, like all circumstantial evidence of

conspiracy, it is not on its own demonstrative of anticompetitive behavior, even when pricing data is what is exchanged." *Id.* at 709 (citing *Todd*, 275 F.3d at 198, and *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999)).

*Omnicare* was decided at summary judgment, but its legal ruling that information-sharing provides evidence of, but is not a complete substitute for, conspiracy, contract, or combination under § 1 applies at the pleading stage as well. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629–30 (7th Cir. 2010). Under *Omnicare*, an agreement to share information, even sensitive non-public data such as pricing data, or as alleged here, forward-looking indicators of demand for hotel rooms, does not, without more, plausibly plead the agreement/concerted-action element of a § 1 claim because "competitors may exchange price information for legitimate business reasons." *Omnicare*, 629 F.3d at 709; *see In re Mfr'd Home Lot Rents Antitrust Litig.*, 2025 WL 3485693, at *9 (N.D. Ill. Dec. 4, 2025); *In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *9–10 (N.D. Ill. Nov. 6, 2020); *see also Container Corp.*, 339 U.S. at 338–39 (Fortas, J., concurring). *Omnicare*'s holding is by itself fatal to Segal's claim, for he argues that the sharing of information is alone sufficient to plead plausibly the agreement element of his § 1 claim. Resp. Opp'n Hotel Mot. to Dismiss 6–10.

The court nevertheless looks further afield in the TAC for allegations lending plausibility to the existence of an agreement in restraint of trade. *See Omnicare*, 629 F.3d at 720–21; *Todd*, 275 F.3d at 198–99. The connection between prices and the information available from Demand360—occupancy, ADR, and RevPAR—remains attenuated and unclear from the TAC. *See* Segal I, 2025 WL 963751, at *6. Where the second amended complaint contained nothing in the way of an explanation of this purported connection, the TAC provides what could be a lesson from an introduction to a microeconomics course, complete with an illustrative line graph showing supply and demand curves intersecting at the market-clearing price. *See* TAC ¶¶ 80–87. These generalized allegations add nothing new of substance and do not render Segal's claim that defendants engaged in concerted action plausible.

Segal alleges that Demand360 data can be used in two ways to produce anti-competitive effects. *See* TAC ¶¶ 63–79. First, in times of high occupancy in a given geographic market, a hotel could charge an inflated rate with confidence that it will not be undercut by a competitor who is out of rooms to rent, particularly where large room blocks for conventions, weddings, etc., are at issue. *See* TAC ¶¶ 63–71. This allegation suffers from a want of supporting data. Segal provides charts of pricing data for the luxury hotel market dating to 2014 but no examples of the supra-competitive prices he alleges might have been achieved. *See* TAC ¶¶ 98–120.

Second, Segal posits that in periods of low or moderate demand, the occupancy data available from Demand360 allow a hotel owner to distinguish market wide downward competitive price pressure from soft overall demand and resist the temptation to lower prices, thereby artificially stabilizing prices. *See* TAC ¶¶ 71–78. This second theory is consistent with the data pleaded in the TAC concerning what occurred in the relevant markets during the COVID-19 pandemic. *See* TAC ¶¶ 98–120. Segal pleads that ADR and RevPAR increased during the pandemic, despite a steep decline in occupancy rates. *See id*. The average daily rate appears to refer to the price charged for a hotel room, so these figures plausibly suggest that prices increased despite the onset of the COVID-19 pandemic in 2020. *See* TAC ¶¶ 16, 112–14.

This theory would require a staggering amount of cooperation among hotel defendants. To make the alleged price stabilization scheme work, each hotel defendant, it is alleged, observed its competitors' future occupancy information via Demand360 and held prices artificially steady, counting on its competitors to use Demand360 to observe its prices and likewise hold prices steady.

Thus, taken in the light most favorable to Segal, his allegations rest at bottom on claims that hotel defendants engaged in parallel conduct that produced price stabilizing effects. Again, Segal disclaims reliance on a hub-and-spoke conspiracy theory, meaning that he does not allege that hotel defendants reached any understanding with each other or used Amadeus as a go between to facilitate collusion. *See* TAC ¶¶ 48–64; *contrast In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 641 (N.D. Ill. 2025) (allegations that algorithm permitted sharing of

price data did not by themselves state a § 1 claim, but allegations that third-party provider acted as a "go between" among the defendants stated a claim).  Since, as pleaded, Segal's § 1 claim rests exclusively on defendants' parallel conduct to allege an agreement in restraint of trade, *Twombly* forecloses it, for *Twombly* holds that parallel conduct does not nudge a § 1 claim across the line from conceivable to plausible.  *See Twombly*, 550 U.S. at 547, 556–71.

In addition, the alleged price stabilization cartel here depends on each luxury hotel operator in a geographic market looking at the same occupancy, ADR, and RevPAR data as all of the others.  Otherwise, there would be no information exchange similar to that in *Container Corp.*  But as far as the TAC shows, Demand360 does not give its subscribers any way to identify the hotels its competitors are observing.  *See* TAC ¶¶ 55–58.  Twenty-two thousand hotels used Demand360 as of 2017, and there is no reason to believe that number decreased in subsequent years.  *See* TAC ¶¶ 22, 61, 95–96.  Each hotel defendant would have to trust that its competitors were looking at the same group of hotels, and trust that the competitors would hold the line on room prices.  And there would be no means of enforcing compliance.

Game theory teaches that such a price stabilization cartel cannot flourish.  "In order to collude successfully, the participants in a cartel must be able to reduce their output and raise their price and also prevent 'cheating' by cartel members."  Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 2031, LexisNexis (database updated Nov. 2024); *see, e.g.*, *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v. Ga.-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018).

Unlike in *Container Corp.*, the TAC alleges no enforcement mechanism to prevent each hotel defendant from cheating by lowering room rates amidst declining demand.  *See Container Corp.*, 393 U.S. at 335–36.  The implausibility of a price stabilization cartel lacking a means of enforcement further justifies applying *Twombly*'s rule in this case: parallel conduct is insufficient by itself to plead a plausible § 1 combination or conspiracy.  *Twombly*, 550 U.S. at 556–57.

### III. CONCLUSION

For the reasons stated, Segal has failed to allege plausibly an agreement or concerted action in restraint of trade sufficient to state a claim under § 1 of the Sherman act. The hotel defendants' motion to dismiss the third amended complaint, Dkt. No. 152, is therefore granted. Amadeus's alternative motion to dismiss for lack of personal jurisdiction, Dkt. No. 154, is denied without prejudice.

Segal has repeatedly failed to cure defects in his prior complaints, and he does not request leave to amend a fourth time. Nor does he identify any additional allegations he could or would plead if given the opportunity. Accordingly, the court declines, on grounds of repeated failures to cure, to grant Segal leave to file a fourth amended complaint. A final judgment dismissing this action will be entered separately.

Date: March 31, 2026

/s/ Joan B. Gottschall
United States District Judge

10